**AFFIRMED; Opinion Filed November 19, 2018.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-17-00238-CR

### JOSE EDUARDO GUERRERO, Appellant
### V.
### THE STATE OF TEXAS, Appellee

**On Appeal from the Criminal District Court No. 6**
**Dallas County, Texas**
**Trial Court Cause No. F15-75211-X**

## MEMORANDUM OPINION
Before Justices Myers, Evans, and Brown
Opinion by Justice Myers

Appellant Jose Eduardo Guerrero was convicted by a jury of murder and sentenced by the trial court to eight years' imprisonment. In three issues, appellant complains of *Brady* violations by the State and that the trial court erred in excluding photographs and video from the victim's Facebook page. We affirm.

### DISCUSSION

### I. Brady: Crime Scene Measurements

In his first issue, appellant argues the State violated *Brady* by failing to provide measurements of the crime scene until the third and fourth days of trial, and that the delay in providing this "important exculpatory evidence . . . until days three and four of the trial significantly impacted the outcome of the trial."

The State has an affirmative duty to disclose all material, exculpatory evidence to the defense. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963). A defendant claiming a *Brady* violation must show that the State suppressed evidence, and that the suppressed evidence was both favorable and material to the defense. *See Harm v. State*, 183 S.W.3d 403, 406 (Tex. Crim. App. 2006). Complaints about *Brady* violations are subject to the preservation requirements of rule 33.1. *See* TEX. R. APP. P. 33.1; *Wilson v. State*, 7 S.W.3d 136, 146 (Tex. Crim. App. 1999). A *Brady* complaint must be made as soon as its grounds become apparent or should be apparent. *See Wilson*, 7 S.W.3d at 146; *In re A.C.*, 48 S.W.3d 899, 905 (Tex. App.—Fort Worth 2001, pet. denied); *Temple v. State*, 342 S.W.3d 572, 591 (Tex. App.—Houston [14th Dist.] 2010), *aff'd*, 390 S.W.3d 341 (Tex. Crim. App. 2013). In addition, where there has been a delayed disclosure of *Brady* evidence, the failure to request a continuance waives any *Brady* violation. *Perez v. State*, 414 S.W.3d 784, 790 (Tex. App.—Houston [1st Dist.] 2013, no pet.); *Taylor v. State*, 93 S.W.3d 487, 502 (Tex. App.—Texarkana 2002, pet. ref'd).

Appellant was indicted for murder, and the indictment against him alleged as follows:

That JOSE EDUARDO GUERRERO, hereinafter called Defendant, on or about 15th day of February, 2015 in the County of Dallas, State of Texas, did unlawfully then and there intentionally and knowingly cause the death of Orlando Pulido, an individual, hereinafter called deceased, by SHOOTING DECEASED WITH A FIREARM, a deadly weapon,

And further did unlawfully then and there intend to cause serious bodily injury to Orlando Pulido, hereinafter called deceased, and did then and there commit an act clearly dangerous to human life, to-wit: by SHOOTING DECEASED WITH A FIREARM, a deadly weapon, and did thereby cause the death of Orlando Pulido, an individual[.]

*See* TEX. PENAL CODE ANN. § 19.02(b)(1), (2).

Officer Jessica Soto of the Dallas Police Department, the lead crime scene analyst in this case, photographed the crime scene and collected evidence. On the third day of trial, the defense questioned her about the importance of scale and asked her whether measurements had been done

in this case. Soto replied that measurements had been taken by her and other crime scene analysts that were on the scene, but sketches with measurements were generally not created unless there was a request for them to do it. Soto did not receive any such request in this case, so she never created a sketch showing her measurements, and no such measurements were provided to the State.

Cross-examination halted and defense counsel informed the trial court that "if there are measurements, we would like to be provided with them." The State responded that it had never received a sketch with measurements and that it was "hearing about it for the first time as well." The defense reiterated that "if there are measurements, I would like to see the measurements, and if they're available where she can get them, give them to her or give them to me. I want to see them." The trial court asked Soto how long it would take for her to produce the measurements, and Soto responded that she would be able to bring them to court the next day. The court ordered Soto to bring the measurements to court as soon as she was done with her testimony.

The following day, in a hearing outside the jury's presence, the State provided the defense with the crime scene measurements, informing defense counsel that "[n]ot only do we have the measurements of the rough sketch that she took with the numbers that you wanted, I asked her to go one step forward, put it in the CAD program and make the diagram that you and your expert requested." Defense counsel did not object or move for a continuance.

Later that day, during the direct examination of the lead detective in this case, Steven David, Soto's diagram of the crime scene, with measurements, was admitted into evidence as State's exhibit 113. Detective David testified that, as part of his investigation, he prepared a rough sketch of the crime scene and used it to aid his interview of witnesses. David testified that although he sometimes received diagrams with measurements from the crime scene, he did not request one in this case because he had personally been at the crime scene and did not need measurements. The defense did not inquire into the issue of measurements during its cross-examination of

Detective David.

The issue of Soto's measurements was raised again during the testimony of Robert Wall, the defense's crime scene reconstruction expert. On redirect, Wall criticized Soto for not doing some of the things that he considered essential when gathering evidence. Wall testified that since Soto did not turn over her measurements to the State, he did not receive those measurements, which he regarded as critical, until halfway through the trial. When defense counsel asked Wall if he had done the best he could with the evidence provided to him by the State, he replied, "And to be fair to both sides, I was retained relatively late, so I didn't have a whole bunch of time to work on this." At the conclusion of Wall's testimony, the trial court stated:

> And I will state for the record, I believe it was when [Soto] was on the witness stand and I asked her if she could provide those measurements, to do so before the end of the day, the day that she testified. That's when those measurements came into anybody's possession.

Again, the defense did not object or request a continuance.

The record shows that, like the defense, the State learned about the crime scene measurements for the first time when Soto testified. *See Jabari v. State*, 273 S.W.3d 745, 756 (Tex. App.—Houston [1st Dist.] 2008, no pet.) ("The *Brady* obligation to disclose evidence generally does not apply to evidence that the State does not possess or does not know to exist.") (citing *Thompson v. State*, 612 S.W.2d 925, 928 (Tex. Crim. App. 1981)). Further, the defense never asserted a *Brady* objection in response to the delayed disclosure of Soto's crime scene measurements, nor did it request a continuance based on that delayed disclosure. *See Rubio v. State*, 534 S.W.3d 20, 26–27 (Tex. App.—Corpus Christi 2017, pet. ref'd) ("'[W]hen *Brady* material is disclosed at trial, the defendant's failure to object to the admission of the evidence on this basis or to request a continuance waives error 'or at least indicates that the delay in receiving the evidence was not truly prejudicial.'"") (quoting *Perez*, 414 S.W.3d at 790 (quoting *Apolinar v. State*, 106 S.W.3d 407, 421 (Tex. App.—Houston [1st Dist.] 2003), *aff'd on other grounds*, 155

S.W.3d 184 (Tex. Crim. App. 2005))). Consequently, appellant did not preserve his *Brady* complaint. *See, e.g., Wilson*, 7 S.W.3d at 146. We overrule appellant's first issue.

## II. Brady: Broken Bottle

In his second issue, appellant contends the State failed to forensically test a broken bottle that was found at the crime scene near the victim's body. Appellant argues that the State's failure to test the bottle violated *Brady* because the testing could have shown the victim cut himself and another individual with the bottle.

The issue of the State's alleged failure to test the broken bottle was raised at two different points during the trial. On cross-examination of crime scene analyst Jessica Soto, defense counsel asked her why a broken beer bottle that had been referenced "somewhere" did not appear in any of her crime scene photographs. Soto answered that the broken beer bottle did, in fact, appear in her photographs and that "[t]he photographs were all turned in together, so I don't know where those photographs are at." Soto testified her job was to collect evidence. She did not participate in decisions on testing and had no knowledge as to which pieces of evidence in the case were tested.

Detective David later testified on direct that he saw "a lot" of beer bottles in the parking lot when he first arrived at the crime scene. He added that the crime scene was the parking lot of a bar. David stated he did not send any of the broken beer bottles that were at the scene to the crime lab to be tested for blood or biological material. Asked why he would not "get all the beer bottles tested," David explained: "There was just too many to pick up. You don't know which one, I mean, I don't know if there were that many that were out there, but I didn't notice any near where we were at that would be of my [sic] significance." The defense did not question Detective David about broken bottles on cross-examination, nor did it assert any type of *Brady* complaint regarding this issue.

Even if one assumes that the State's alleged failure to test a broken bottle at the crime scene amounted to a *Brady* violation, a conclusion we need not reach in this case, appellant never made any type of *Brady* objection at trial regarding this issue. Thus, he failed to preserve his *Brady* complaint. *See, e.g., Wilson*, 7 S.W.3d at 146. We overrule appellant's second issue.

### III. Facebook Page: Photographs and Video

In his third issue, appellant argues the trial court erred by excluding photographs and video from the deceased victim's Facebook page. Appellant claims the "pictures of drugs, intoxication, [and] brandishing [of] weapons" and the "video of a vicious beating narrated by the deceased" were relevant (1) to show the reasonableness of appellant's fear of the deceased, and (2) to show the deceased was the violent first aggressor in their encounter.

Beginning with the photos, the photographs in question were offered through the testimony of Julio Munoz and Jose Brandon Hernandez, two individuals who were part of a group that was with the victim on the night he died. In a hearing out of the jury's presence, Julio Munoz was shown various photographs from the victim's Facebook page and asked which of them he recognized. The five photos Munoz recognized were marked as the defendant's exhibits 1 through 5. With respect to these photos, the defense argued they were relevant because they showed "drinking and gang signs," which gave "some defensive value to what the activity that [the victim] spent most of his time on." The defense also argued the photos were relevant to show the violent character of the victim's friends:

> . . . I think that the drugs, alcohol, guns and gang stuff that were on the Facebook page are relevant to the trial and that suddenly, under their witnesses, that this all miraculously happened where they didn't start the fight, didn't knock the fellow that got his teeth kicked out, weren't the cause of the problem, didn't do anything wrong.

> And I think that the stuff that's on the Facebook page establishes what the—what the group was like and what they did, and I think they were a bunch of thugs that were out there doing that on a regular basis, and I think this lends credence to the fact that that's what was going on.

In another hearing out of the jury's presence, Jose Brandon Hernandez said he recognized two additional photos from the victim's Facebook page, and those photos were marked as the defendant's exhibits 6 and 7. The trial court ultimately excluded the photos on relevancy grounds; however, they were admitted for record purposes.

The State argues that appellant's complaint was not preserved for appellate review because the argument he is making on appeal, i.e., that the photographs were relevant to show the reasonableness of his fear of danger and to show the victim was the violent first aggressor during their encounter, was not made at trial. We need not resolve this question. Even if we assume appellant's complaint was preserved, there was no abuse of discretion.

We review the trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). The trial court abuses its discretion when its ruling is arbitrary, unreasonable, or without reference to any guiding rules or principles. *Lyles v. State*, 850 S.W.2d 497, 502 (Tex. Crim. App. 1993). The trial court does not abuse its discretion unless its determination lies outside the zone of reasonable disagreement. *Martinez*, 327 S.W.3d at 736.

In prosecutions for homicides and other assaultive offenses, a defendant who raises the issue of self-defense may offer evidence of the victim's character for violence under two separate theories. *See Ex parte Miller*, 330 S.W.3d 610, 617 (Tex. Crim. App. 2009); *see also Torres v. State*, 71 S.W.3d 758, 760–62 (Tex. Crim. App. 2002). Under the first theory, the defendant may offer reputation or opinion testimony, or evidence of specific prior acts of violence by the victim to show the reasonableness of the defendant's claimed fear of danger from the victim. *See Miller*, 330 S.W.3d at 618. This is called "communicated character" evidence because the defendant knows of the victim's violent tendencies and sees a danger posed by the victim, regardless of whether or not that danger is real. *See id*. The defendant is not trying to prove the victim was

actually violent, but that his fear of the victim during their confrontation was reasonable. *See id*. at 619. Under the second theory—called "uncommunicated character" evidence because it does not matter whether the defendant knew of the victim's violent character—a defendant may offer evidence of the victim's character trait for violence to show that the victim was, in fact, the first aggressor. *See id*.; *see also* TEX. R. EVID. 404(a)(2). "The chain of logic is as follows: a witness testifies that the victim made an aggressive move against the defendant; another witness then testifies about the victim's character for violence, but he may do so only through reputation and opinion testimony under Rule 405(a)." *Miller*, 330 S.W.3d at 619.

The disputed evidence does not fall under either of these theories. The seven photos show the victim in various non-confrontational settings, either alone or with friends, and he is sometimes holding what appear to be alcoholic drinks. In one of the photos he is holding up a bottle of Crown Royal. The victim is also shown displaying his middle finger in five of the photos; there are no weapons visible in any of them. Munoz testified during the hearing that there were no gang signs visible in any of the five photos he recognized.

The photographs are not opinion or reputation testimony, and they do not show any prior acts of violence by the victim. Nor is there evidence appellant had any knowledge of the photos at the time of his confrontation with the victim. Indeed, defense counsel told the trial court, "I'm not asserting in any way that the defendant knew about these photographs at any time during this." We conclude the trial court did not abuse of discretion in finding the seven photographs inadmissible.

As for the alleged video from the victim's Facebook page, the reporter's record on file shows appellant played the video for the trial court outside the presence of the jury, near the end of the first day of trial. The trial court did not admit the video for any purpose at that time. During punishment on the final day of trial (December 13, 2016) defense counsel offered, and the trial

court admitted, the defendant's exhibits 10 through 14, which were identified by the defense in open court as "documents." Defense counsel also sought, once again, to introduce the video. But it did not appear to us, based on the discussion on the record, that the video was on a CD/DVD at the time it was offered or that it was given an exhibit number. Nevertheless, the trial court stated, in response to the State's hearsay objection, "I will sustain the objection for all purposes, but I will allow it for record purposes only."

It appeared from the record that the video was admitted for record purposes, so we examined the reporter's record for the DVD/video but did not find it. Additionally, the defendant's exhibit 14, which is identified in the reporter's record as a "DVD/VIDEO," is not in the record. Because the Facebook video is a significant part of appellant's third issue, we ordered (on October 10, 2018) the trial court to conduct a hearing and make findings regarding, among other things, whether the defendant's exhibit 14 is a document or a DVD/video; and whether (if the exhibit 14 was not a document) the victim's Facebook page video is the defendant's exhibit 14 and whether it was placed on a CD/DVD and given to the court reporter for record purposes before the conclusion of trial.

We have received the trial court's findings. They state, in part, that the defendant's exhibit 14 was supposed to be a copy of a video from the victim's Facebook page, but it was not placed on a CD/DVD and given to the court reporter for record purposes before the conclusion of the trial. The trial court also found that the court reporter has a blank CD/DVD that was given to her before the conclusion of the trial. The exhibit has not been lost or destroyed. Moreover, the court found that since the CD/DVD presented to the court reporter was blank and the State and the defense could not agree on a substituted exhibit, no supplemental reporter's record containing the video would be filed.

Appellant includes four different screenshots from the video in an appendix to his brief. In

addition, he has tendered, along with his "Motion to Correct Inaccuracies in Reporter's Record," in which he stated that the defendant's exhibit 14 was "defective and unable to be reviewed," a CD entitled "EXHIBIT." This motion also includes the same four screenshots from the Facebook video that appeared in the appendix to appellant's brief. We disposed of this motion in our order of October 10, 2018, in which we granted the motion only to the extent that we ordered the trial court to conduct a hearing and prepare findings regarding, as more fully explained above, the status of the Facebook video and the defendant's exhibit 14.

Appellant has now filed an "Amended Motion to Correct Inaccuracies in Reporter's Record" that includes those same four screenshots from the Facebook video. In this amended motion appellant again argues, as he did in his previous motion, that we should enter an order submitting this dispute to the trial court for resolution and order the reporter's record be made to conform to what occurred in the trial court. The amended motion includes an exhibit page stating that the "Facebook video was hand-delivered as exhibit to Motion to Correct Inaccuracies in Reporter's Record," a reference to appellant's previous motion on this matter.

We have already referred this matter to the trial court for resolution once before, and we need not so do again. As supplemented by the trial court's findings, the record shows that the Facebook video was published in court, but it was never made part of the record. *See Haygood v. State*, 127 S.W.3d 805, 812 (Tex. App.—San Antonio 2003, pet. ref'd) ("To preserve a complaint that the trial court erroneously excluded evidence, the complaining party must bring forward a record indicating the nature of the evidence."). Furthermore, it is a well-established principle that an appellate court must determine a case based on the record as filed and cannot consider documents attached to briefs when, as in this case, those documents do not appear in the appellate record. *See Blank v. State*, 172 S.W.3d 673, 675 n. 1 (Tex. App.—San Antonio 2005, no pet.); *Rimes v. State*, No. 05–08–01543–CR, 2009 WL 3298181, at *5 (Tex. App.—Dallas Oct. 15, 2009,

–10–

no pet.) (not designated for publication); *Allison v. State*, No. 01–01–00383–CR, 01–01–00384–CR, 01–01–00385–CR, 01–01–00386–CR, 2002 WL 31388717, at *4–5 (Tex. App.—Houston [1st Dist.] Oct. 24, 2002, pet. ref'd) (not designated for publication); *see also Wright v. State*, 178 S.W.3d 905, 916–17 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd) (appellate court could not consider DVD attached to motion for new trial because it was not introduced at new trial hearing). Accordingly, to the extent appellant's complains about the exclusion of the Facebook video, there is nothing for us to review.  We overrule appellant's third issue.

We affirm the trial court's judgment.


/Lana Myers/
LANA MYERS
JUSTICE


Do Not Publish
TEX. R. APP. 47.2(b)
170238F.U05



# Court of Appeals
# Fifth District of Texas at Dallas
## JUDGMENT

JOSE EDUARDO GUERRERO, Appellant

No. 05-17-00238-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court No. 6, Dallas County, Texas
Trial Court Cause No. F15-75211-X.
Opinion delivered by Justice Myers.
Justices Evans and Brown participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 19th day of November, 2018.